## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Su Yang, | Case No. 17-cv-0686 (HB) |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill, Acting Commissioner of Social Security, | |
| Defendant. | |

Stephanie Ann Christel, Livgard and Lloyd PLLP, 2520 University Avenue Southeast, Suite 202, Minneapolis, MN 55414, for Plaintiff Su Yang

Bahram Samie, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant Nancy A. Berryhill

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Su Yang seeks judicial review of a final decision by the Acting Commissioner of Social Security denying her applications for supplemental security income (SSI) and disability insurance benefits (DIB). The matter is now before the Court on the parties' cross-motions for summary judgment [Doc. Nos. 16, 18]. For the reasons set forth below, the Court grants Yang's summary judgment motion, denies the Commissioner's motion, reverses the Commissioner's decision, and remands the matter pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order.

## I.    Procedural Background

Yang filed applications for SSI and DIB on November 7, 2013, alleging a disability onset date of March 31, 2013.  (R. 193-206).[1]  Yang claimed she was disabled by depression, back and spinal impairments with pain, and neuropathy/radiculopathy.  (R. 223.)  Her applications were denied initially and on reconsideration, and she requested a hearing before an administrative law judge (ALJ).

The ALJ convened a hearing on November 20, 2015, at which Yang, psychologist Dr. Karen Butler, and vocational expert Norman Nussbaum testified.  (R. 40-41.)  Yang, whose primary language is Hmong, testified through an interpreter.  (R. 43.)  She testified that she moved to the United States many years ago and has a fifth grade education.  (R. 47.)  She worked as a seamstress in the approximately fifteen years before her disability onset date.  (R. 47-48.)  Before that, she assembled medical ear devices at Starkey Labs.  (R. 48.)  Yang stopped working as a seamstress because of back, hip, and leg pain.  (R. 49.)  She also suffered from dizziness and depression.  (R. 52.)  Yang testified that she was depressed because of her limitations and did not want to live anymore.  (R. 52.)  At the time of the hearing, she no longer cooked or cleaned and had trouble staying focused and concentrating.  (R. 53.)

Yang testified that back surgery had not alleviated her back pain.  (R. 49.)  She declined a second surgery suggested by her doctor because she had not benefited from the first.  (R. 51.)  Physical therapy increased the pain.  (R. 51-52.)  Yang used a four-pronged cane when walking to alleviate her low back pain.  (R. 50.)  Yang had stopped

---

[1]  The Social Security Administrative Record ("R.") is available at Doc. No. 12.

driving to her medical appointments about two years before the hearing because her doctor told her she should no longer drive and her children forbade her from it. (R. 46-47.) Since January 2014, a personal care attendant (PCA) assisted her each morning and night with various daily activities, going to the bathroom, bathing, dressing, medication, and nutrition. (R. 53-54.)

Testifying as an independent medical expert, Dr. Butler testified that Yang had mental impairments of depression and pain disorder. (R. 55.) According to Dr. Butler, Yang's depression waxed and waned and did not meet the twelve-month durational threshold for a listing-level impairment.[2] (R. 59.) Dr. Butler noted only isolated instances of anxiety, panic disorder, and auditory hallucinations. (R. 55, 61.) Dr. Butler opined Yang was moderately impaired in activities of daily living, social functioning, and concentration, persistence, and pace. (R. 56.) Dr. Butler recommended work-related limitations of simple, unskilled work that could be visually demonstrated, and brief and superficial contact with others. (R. 59.) On questioning from Yang's attorney, Dr. Butler conceded that accounting for Yang's pain and physical symptoms would be outside her area of expertise, but "clearly, that would impose additional limitations." (R. 60.)

The ALJ asked Nussbaum, the vocational expert, to consider a hypothetical individual of the same age, education, vocational, and academic background as Yang, with the following limitations: able to lift and carry ten pounds occasionally and less than ten pounds frequently; able to sit for six hours in an eight-hour day; able to stand or walk for two hours in an eight-hour day; able to push and pull the same as lift and carry; able

---

[2]  The Listing of Impairments is located in 20 C.F.R. part 404, subpart P, appendix 1.

3

to climb ramps and stairs occasionally; not able to climb ladders or scaffolds; not able to balance; able to stoop, kneel, crouch, and crawl occasionally; not able to work at unprotected heights or exposed moving mechanical parts; limited to simple routine tasks with instructions that are visibly demonstrated; and able to respond appropriately to supervisors, coworkers, and the public on an occasional basis.  (R. 62-63.)  Nussbaum testified that an individual with those characteristics and restrictions could perform the medical device assembly work Yang had performed previously.  (R. 63.)  If the individual required the use of a cane to ambulate to or from the workstation, however, work would be precluded due to the need to simultaneously carry a tray.  (R. 64-65.)  The ALJ then modified the hypothetical question to add the following limitations: sitting no more than two hours in an eight-hour day, requiring a cane to ambulate to and from the workstation, and absent from work four days per month.  (R. 63-64.)  Nussbaum testified that work would be precluded under that hypothetical situation.  (R. 64.)

On December 11, 2015, the ALJ issued a written decision denying Yang's SSI and DIB applications.  (R. 19-33.)  Pursuant to the five-step sequential process outlined in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ first determined that Yang had not engaged in substantial gainful activity since March 31, 2013.  (R. 24.)  At step two, the ALJ determined that Yang had severe impairments of degenerative disc disease of the lumbar spine with radiculopathy, status-post right lumbar microdiscectomy in 2006, sacroiliitis and hip pain, vertigo and dizziness, and major depressive disorder with psychotic features.  (R. 24.)  The ALJ found at the third step that none of Yang's impairments, considered singly or in combination, met or equaled the severity of an

4

impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 24-25.)  With respect

to Yang's mental impairments, the ALJ determined that Yang did not meet or equal the

criteria of Listing 12.04 (affective disorders).  (R. 25.)  The ALJ found Yang mildly

restricted in activities of daily living, moderately limited in social functioning, and

moderately limited in concentration, persistence, or pace.  (R. 25-26.)  Yang had no

episodes of decompensation of at least two weeks in duration.  (R. 26.)

At step four, the ALJ concluded that Yang retained the residual functional

capacity (RFC)[3] to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and

416.967(a), with the following restrictions: lifting, carrying, pushing, and pulling limited

to ten pounds frequently and less than ten pounds occasionally; sitting for six hours;

standing for two hours and/or walking for two hours in an eight-hour day; occasional

climbing of ramps or stairs; no climbing ladders or scaffolds; no balancing; occasional

stopping, kneeling, crouching, and crawling; no exposure to unprotected heights; no

exposure to moving mechanical parts; limited to simple, routine tasks with instructions

that are visually demonstrated; and occasional ability to respond appropriately to

supervisors, coworkers, and the public.  (R. 27.)  In arriving at this RFC, the ALJ found

that Yang's statements concerning the intensity, persistence, and limiting effects of her

symptoms were not entirely credible.  (R. 28-30.)  In addition, the ALJ gave little weight

to the opinions of Yang's treating psychiatrist Dr. Joseph M. Bebchuk, primary care

---

[3]  An RFC assessment measures the most a person can do, despite her limitations.
20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ must base the RFC "on all relevant
evidence, including medical records, observations of treating physicians and others, and
the claimant's own descriptions of his or her limitations."  *Eichelberger v. Barnhart*,
390 F.3d 584, 591 (8th Cir. 2004).

physician Dr. Deborah Mielke, and treating therapists Willie B. Garrett and Kathie Bailey.  (R. 31-32.)  The ALJ gave substantial or significant weight, however, to the opinions of state agency consulting physicians Dr. Shanti Tanna and Dr. Cliff Phibbs, state agency consulting psychologist Dr. Maura Clark, and Dr. Butler.  (R. 30-31.)

The ALJ found significant that some treatment modalities, namely epidural steroid injections and surgery, had been at least somewhat effective in managing or alleviating Yang's back pain, but Yang had declined additional injections and surgery, both of which were recommended by her doctors.  (R. 28-29.)  In addition, clinical findings and observations were frequently unremarkable, Yang's symptoms waxed and waned, and her providers' treatment regimens were conservative and routine.  (R. 29-30.)

The ALJ concluded that Yang had retained the RFC to perform her past relevant work as an assembler at the sedentary, unskilled level, both as the work was actually performed and generally performed.  (R. 33.)  The ALJ categorized her past work as an assembler under the *Dictionary of Occupational Titles* (DOT) 712.687-034 Consequently, the ALJ determined that Yang was not under a disability, as defined by the relevant regulations between March 31, 2013, and the date of the decision.  (R. 33.)

The Appeals Council denied Yang's request for review, which made the ALJ's decision the final decision of the Commissioner.  Yang then filed this action for judicial review.  She identifies four issues in her motion for summary judgment: (1) whether the ALJ did not give proper weight to the opinions of her treating physicians and therapists, (2) whether the ALJ erred in failing to consider the combined effect of her physical and mental impairments in assessing whether Yang medically equaled Listing 12.04,

6

(3) whether the ALJ erred in assessing Yang's RFC, and (4) whether the ALJ erred in finding that Yang could perform her past relevant work.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB, the claimant must

establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The same standard applies to SSI. *See* 42 U.S.C. § 1382c(a)(3)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III.   Discussion

### A.   Opinions of Treating Providers

Yang argues that the ALJ erred by failing to give proper weight to the opinions of treating psychiatrist Dr. Joseph M. Bebchuk, primary care physician Dr. Deborah Mielke, and treating therapists Willie B. Garrett[4] and Kathie Bailey. (Pl.'s Mem. Supp. Mot. Summ. J. at 28 [Doc. No. 17].)

A treating source's opinion on the nature and severity of a claimed impairment is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[5] The ALJ need not give controlling weight to an opinion that is not well-supported by clinical

---

[4]  Contrary to Yang's designation, Garrett is not a physician. He has a master's degree and is a licensed practitioner. (R. 594.)

[5]  These regulations have been amended for claims filed after March 27, 2017. Because Yang filed her claims before that date, the Court will apply the prior version of the regulations.

findings or laboratory techniques or is inconsistent with other substantial evidence.
*Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009). If the opinion of a treating source
is not afforded controlling weight, the ALJ must consider the following factors in
deciding what weight is due: (1) the existence of an examining relationship; (2) the nature
of the treatment relationship, such as length of treatment and frequency of examination;
(3) the degree to which the opinion is supported by medical evidence such as medical
signs and laboratory findings; (4) consistency with the record; (5) the source's specialty;
and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).

The ALJ is not required to explicitly discuss each and every §§ 404.1527(c) and
416.927(c) factor. *See Combs v. Colvin*, No. 8:12-cv-429, 2014 WL 584741, at *11 (D.
Neb. Feb. 12, 2014); *Derda v. Astrue*, No. 4:09-cv-1847 AGF, 2011 WL 1304909, at *10
(E.D. Mo. Mar. 31, 2011). It is sufficient that an ALJ considered the listed factors, *see*
§§ 404.1527(c) and 416.927(c), and that the ALJ indicated in his written decision that he
has done so.

### 1.     Dr. Bebchuk

Dr. Bebchuk completed a mental impairment questionnaire on June 9, 2015.
(R. 602-06.) He recorded a diagnosis of major depressive disorder, recurrent with
psychotic features; and described Yang's symptoms as a depressed mood, auditory
hallucinations, anhedonia, fatigue, poor concentration, and hopelessness. (R. 602.) He
indicated that Yang had responded minimally to treatment and medications, and that her
depression exacerbated her back pain. (R. 602.) Dr. Bebchuk declined to assess Yang's
work-related activities, explaining that he did not assess his patients' abilities as part of

his clinical practice. (R. 604.) He did indicate, however, that Yang would be extremely

limited in activities of daily living, extremely limited in maintaining social functioning,

and markedly limited in maintaining concentration, persistence, or pace. (R. 605.)

Dr. Bebchuk also indicated that Yang had suffered four or more episodes of

decompensation in the past twelve months[6] and met the paragraph C.2 criteria of Listing

12.04,[7] and he predicted that she would miss more than four days of work a month.

(R. 605.)

---

[6] As defined by regulation and included on the questionnaire completed by Dr. Bebchuk,
"[e]pisodes of decompensation are exacerbations or temporary increases in symptoms or
signs accompanied by a loss of adaptive functioning, as manifested by difficulties in
performing activities of daily living, maintaining social relationships, or maintaining
concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.4.
This regulation has since been amended, but the Court uses the version in effect at the
time the ALJ issued his decision.

   An episode of decompensation may be inferred from a significant change in
medication, from a hospitalization, or from placement in a halfway house or other highly
structured living situation. *Id.* The phrase "repeated episodes of decompensation, each
of extended duration" means three episodes in a year, each of which lasted for at least
two weeks. *Id.*

[7] Paragraph C.2 of Listing 12.04 provides:

   C. Medically documented history of a chronic affective disorder of at least
   2 years' duration that has caused more than a minimal limitation of ability
   to do basic work activities, with symptoms or signs currently attenuated by
   medication or psychosocial support, and one of the following:
   . . .
         2. A residual disease process that has resulted in such marginal
         adjustment that even a minimal increase in mental demands or
         change in the environment would be predicted to cause the
         individual to decompensate . . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.2. This listing has since been
amended, but the Court uses the version in effect on the date the ALJ issued his
decision.

The ALJ noted that Dr. Bebchuk was Yang's treating psychiatrist but gave the opinion little weight for several reasons.  (R. 32.)  The ALJ wrote that Dr. Bebchuk's opinion was "not at all supported by the overall mental status examinations" and was inconsistent with Yang's conservative course of treatment and Yang's activities.  (R. 32.) The ALJ also found the opinion inconsistent with evidence that Yang's mental symptoms waxed and waned and did not meet the twelve-month durational requirement.  (R. 32.) Finally, the ALJ found that "not a shred of evidence" supported Dr. Bebchuk's assertion that Yang had four or more extended episodes of decompensation.  (R. 32.)

The Court finds that substantial evidence supports the ALJ's decision to give little weight to Dr. Bebchuk's opinion, and that the ALJ gave good reasons for discounting the opinion.  The ALJ declined to give controlling weight to Dr. Bebchuk's opinion because it was inconsistent with other substantial evidence.  The ALJ did not err in this respect. (*See, e.g.*, R. 500-01 (noting no impairment with attention, concentration, or memory); R. 514-16 (documenting a generally normal mental status examination, "unremarkable" concentration and attention, normal memory, and "open and engaging" behavior); R. 520 (finding normal concentration, attention, and memory; average intelligence); R. 544 (recording no hallucinations, normal affect); R. 718 (reporting less anxiety, no previous psychiatric hospitalizations); R. 722 (noting increased stress and hopelessness due to temporary financial situation); R. 726 (recording improvement with depressive symptoms but feeling overwhelmed by caring for son with special needs); R. 819-20 (reporting normal mental state and normal dizziness test results); R. 828 (documenting moderate depression).)

11

The ALJ indicated at the beginning of the RFC discussion in his written decision that he had considered all opinion evidence in accordance with §§ 404.1527 and 416.927. (R. 27.)  In deciding the weight due to Dr. Bebchuk's opinion, the ALJ noted that Dr. Bebchuk was a psychiatrist and Yang's treating source, but found that the opinion was not supported by mental status examinations and was not consistent with the conservative course of treatment Dr. Bebchuk administered.  These findings are well-documented in the record.  Yang's mental status examinations frequently revealed normal attention and concentration, no memory impairment, average intelligence, good judgment and insight, and a history of (but no current) auditory hallucinations.  (*E.g.,* R. 728-29, 732-33, 736-37, 740-71, 744-45.)  The mental status examinations were certainly not consistent with being markedly restricted in activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace, for a twelve-month period.  In addition, Yang's depression and other mental impairments were conservatively managed with medication, monthly medication evaluations with Dr. Bebchuk, and biweekly therapy sessions.

The ALJ also reduced the weight of Dr. Bebchuk's opinion because the limitations suggested by Dr. Bebchuk were inconsistent with some of Yang's activities.  Treatment records from Yang's providers contain very little detail about her activities, but Yang completed a function report in December 2013, indicating that she could cook simple meals, wash small loads of laundry, occasionally go to the doctor by herself, occasionally shop for groceries, and garden.  (R. 233-36.)  She socialized primarily with her children, conversing and having dinner with them after they came home from work.  (R. 236, 239.)

A function report completed in August 2014 reveals that Yang's daily activities were more restricted, but she could still prepare simple lunches, and drive and shop occasionally. (R. 261-68.) Yang said that her daughter PaChia, with whom she lived, was her PCA at that time. (R. 262.) Importantly, because the ALJ found Yang only partially credible—a finding Yang does not challenge—that finding may be applied to other evidence of record based on subjective complaints or self-described symptoms and limitations.[8] *See Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011). Thus, while some of the symptoms and limitations described on Yang's function reports are consistent with Dr. Bebchuk's opinion, the ALJ did not err in disregarding those self-reported symptoms and limitations.

Finally, the ALJ correctly observed that "not a shred of evidence" supports Dr. Bebchuk's finding that Yang has had four or more extended episodes of decompensation. Indeed, the record does not contain evidence of even one such episode. Such a significant error—whether due to a misunderstanding of the definition of the term "episode of decompensation" or to a mischaracterization of the record—reasonably called into doubt the validity of Dr. Bebchuk's entire opinion.

### 2.   Garrett

Garrett completed mental impairment questionnaires in May and September 2015, both of which the ALJ discussed in his written decision. (R. 32, 588-98.) In the earlier

---

[8]  SSR 16-3p removed the word "credibility" from the evaluation of a claimant's symptoms and subjective complaints. SSR 16-3p, 2017 WL 5180304, at *2 (S.S.A. Oct. 25, 2017). SSR 16-3p became effective on March 28, 2016, after the ALJ's decision, and the Court thus refers to Yang's "credibility" when discussing inconsistencies between Yang's statements and other evidence in the record.

questionnaire, Garrett indicated that Yang could not perform at a consistent pace without an unreasonable number and length of rest periods, remember work procedures, maintain attention for two hours at a time, maintain attendance and punctuality, follow an ordinary routine without supervision, make simple work-related decisions, or deal with normal work stresses, among other restrictions. (R. 596.) Garrett opined that Yang was markedly limited in activities of daily living and in maintaining concentration, persistence, or pace. (R. 597.) Garrett also opined that Yang met the paragraph C.2 criteria of Listing 12.04 and predicted she would miss more than four days of work a month. (R. 597.) He attributed her limitations to major depression, which he classified as "Recurrent Moderate," positional vertigo, and chronic pain. (R. 594, 596.) He further indicated that her symptoms of depression had been reduced with treatment. (R. 594.) Garrett indicated even greater restrictions on the September 2015 questionnaire. (R. 590-91.)

The ALJ discounted Garrett's opinions as inconsistent with treatment records that reflected only temporary exacerbations of symptoms and a conservative course of treatment, and for the other reasons he gave for discounting Dr. Bebchuk's opinion. (R. 32.) This Court's finding that substantial evidence supports the ALJ's decision to give little weight to Dr. Bebchuk's opinion applies with equal force to Garrett's opinion. Moreover, unlike Dr. Bebchuk, Garrett rarely noted on his treatment records specific findings concerning Yang's abilities to concentrate, pay attention, function socially, or maintain persistence or pace. Garrett's progress notes consisted of two or three sentences describing Yang's subjective complaints, noting that she appeared sad and anxious,

14

assessing her with major depression, and directing her to return in two to three weeks.

(*E.g.*, R. 581, 582, 859, 876, 883.)  There are no detailed clinical findings or mental status

examination results comparable to the information contained in Dr. Bebchuk's treatment

records.

In sum, the ALJ did not err in assigning little weight to the opinions expressed by

Garrett on the mental impairment questionnaires he completed in May and September

2015.

### 3.    Dr. Mielke

Dr. Mielke completed a Physical Residual Functional Capacity Questionnaire on

June 9, 2015.  (R. 599-601.)  She indicated diagnoses of severe chronic depression and

lumbar degenerative disc disease with radiculopathy.  (R. 599.)  Dr. Mielke listed

symptoms of low back pain, leg pain, leg weakness, fatigue, mental confusion, and

daytime sleepiness.  (R. 599.)  According to Dr. Mielke, depression and anxiety also

affected Yang's physical condition.  (R. 599.)  Medication did not control Yang's pain

and made concentration difficult.  (R. 600.)  Dr. Mielke indicated work restrictions of

sitting no more than fifteen minutes at a time, standing no more than fifteen minutes at a

time, standing or walking less than two hours in a workday, and sitting about two hours

in a workday.  (R. 600.)  Yang would need to walk around every fifteen minutes for five

minutes, according to Dr. Mielke, yet Dr. Mielke also indicated that Yang could not walk

longer than a city block at a time.  (R. 600.)  Yang would also need to take five-minute

unscheduled breaks every thirty minutes.  (R. 601.)  Dr. Mielke estimated that Yang

could never carry any amount of weight, twist, stoop, crouch, or climb.  (R. 601.)  She would be absent more than four days a month.  (R. 601.)

The ALJ gave Dr. Mielke's opinion little weight because it was not supported by clinical findings and signs, course of treatment, response to treatment, and activities. (R. 31.)  In addition, the ALJ noted that Dr. Mielke relied heavily on Yang's subjective reports of symptoms and limitations and accepted nearly everything reported by Yang as true, whereas the ALJ found reason to doubt Yang's reliability.  (R. 31.)

The Court finds that substantial evidence supports the ALJ's decision to give little weight to Dr. Mielke's opinion, and that the ALJ gave good reasons for doing so.  The ALJ declined to give controlling weight to Dr. Mielke's opinion because it was not supported by clinical findings and was inconsistent with a conservative course of treatment, with Yang's response to treatment, and with Yang's activity level.  These are legitimate reasons to discount Dr. Mielke's opinion, and the ALJ did not err in doing so. (*See, e.g.*, R. 354, 458 (documenting normal gait, station, and muscle tone); R. 459, 461 (noting physical therapy, massage, chiropractor, and medications were somewhat helpful); R. 461-62 (documenting physical examination findings of moderate restrictions in lumbar soft tissue areas, normal hip range of motion, and balance issues attributed to "unsupportive clogs"); R. 466 (noting a slow gait, normal station, and normal muscle tone; reporting medications were "helpful" and had no side effects); R. 532 (noting success of physical therapy and muscle-strengthening exercises, and recommending additional physical therapy and a back brace); R. 544-45 (noting objective findings of normal neurological strength and tone, normal sensory exam, and no back tenderness;

16

commenting "may not need medication at this time"); R. 631 (recording normal neurological strength and tone except for hip flexors, normal fine and general motor control, and normal gait); R. 796 (finding good strength and sensation on direct examination); R. 832 (documenting normal neurological strength and tone, and functional lower extremity strength).) Lumbar spine imaging in April 2015 was unremarkable, revealing only mild or moderate bulging, degeneration, and other findings. (R. 812-13.)

In addition, though epidural steroid injections had proved helpful in managing pain previously, Yang declined further injections and opted to continue with only oral medication. (R. 466, 481, 547, 796, 853.) Yang also declined surgery recommended by her doctor (R. 541, 547, 796) and ceased going to physical therapy without notice (R. 624). Yang's dizziness was resolved with treatment at the National Dizzy and Balance Center. (R. 663.) Finally, as discussed above, Yang's activities were not entirely consistent with the restrictions opined by Dr. Mielke, and the reported severity of her symptoms and limitations was not believable.

In deciding what weight to give Dr. Mielke's opinion, the ALJ noted that Dr. Mielke was a treating family practitioner. He assigned the opinion little weight, however, for the reasons set forth above; namely, the opinion was not supported by medical evidence such as medical signs and clinical findings and was not consistent with other substantial evidence of record. Furthermore, the opinion was based largely on Yang's self-reports. When an ALJ finds a claimant is only partially credible, as the ALJ did here, the ALJ may apply that finding to other evidence in the record that is based on

the claimant's subjective complaints or self-reported symptoms. *See Vance*, 860 F.3d 1114, 1120 (8th Cir. 2017).

### 4.    Bailey

Unlike Dr. Bebchuk, Garrett, and Dr. Mielke, Bailey is categorized under the relevant regulations as an "other source," rather than a "treating source" or an "acceptable medical source." 20 C.F.R. §§ 404.1513(d), 416.913(d).[9] Evidence from "other sources" may be used "to show the severity of [an] impairment and how it affects [the claimant's] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d). An "other source" cannot provide the requite medical evidence needed to establish an impairment and does not qualify for "controlling weight" deference, however. *See* 20 C.F.R. §§ 404.1502(a), 404.1513(d), 404.1527, 416.902(a), 416.913(d), 416.927.

Yang attended therapy sessions with Bailey for pain management, depression, and related symptoms. (R. 584.) Similar to Dr. Bebchuk and Garrett, Bailey deemed Yang markedly limited in activities of daily living and maintaining social functioning, and extremely limited in maintaining concentration, persistence, and pace. (R. 586.) Bailey also checked a box indicating that Yang had a complete inability to function independently outside the home. (R. 586.) Bailey opined that Yang would not be able to work because of paranoia, distractedness, poor concentration, and persistent pain. (R. 587.)

---

[9] These regulations have also been amended. The Court uses the version in effect at the time of the ALJ's decision.

The ALJ gave Bailey's opinion little weight for the same reasons he discounted Dr. Bebchuk's and Garett's opinions. The Court has already found that the ALJ considered those opinions and gave good reasons for reducing their weight. The same discussion applies to Bailey's opinion. In addition, as the ALJ noted, there is no evidence in the record to support the finding that Yang cannot function outside her home. (R. 32.)

### 5.    Non-Treating, Non-Examining Physician Assessments

Yang argues that if the opinions of her treating sources are given little weight, the only evidence supporting the ALJ's RFC is assessments of non-treating, non-examining physicians. Yang submits that "such assessments alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician." *See Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

There are several problems with Yang's argument. First, the Court has found that the ALJ properly discounted the weight of certain opinions expressed on questionnaires completed by Dr. Bebchuk, Dr. Mielke, Garrett, and Bailey. Because the opinions were afforded little weight, they are not "conflicting assessment[s] of a treating physician" with which the non-treating, non-examining physician assessments must be reconciled. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) (where reports of treating physicians were not entitled to significant weight, finding the ALJ properly considered the consulting physician's opinion along with other medical evidence in the record).

Second, non-treating, non-examining medical and psychological consultants "are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the [Social Security] Act." SSR 17-2p, 2017 WL 3928306, at

*3 (S.S.A. Mar. 27, 2017).  The ALJ may consider evidence from non-treating, non-examining medical and psychological consultants as medical opinion evidence.

20 C.F.R. §§ 404.1527(e), 404.1513a(b), 416.927(e), 416.913a(b).  Here, the ALJ considered the opinions of consulting physicians Dr. Shanti Tanna and Dr. Cliff Phibbs concerning Yang's physical impairments and limitations, and the opinions of Dr. Butler and consulting psychologist Dr. Maura Clark concerning Yang's mental impairments and limitations.  (R. 30-31.)  The ALJ explained that he gave significant or substantial weight to the opinions of the medical and psychological consultants because they were consistent with the objective clinical findings and medical signs documented by Yang's own providers, the nature of treatment, Yang's response to treatment, and Yang's activities.

(R. 30-31.)  The Court finds the ALJ did not err in his consideration of these opinions or the weight he assigned them.

### B.    Paragraph B Criteria of Listing 12.04

The ALJ found at step three that Yang's impairments did not meet or equal the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  One of the listings the ALJ considered was Listing 12.04 (affective disorders), and Yang contends the ALJ erred in this regard.  Yang argues that the ALJ failed to consider the combined effects of her physical and mental impairments in determining whether they met or equaled Listing 12.04.  She relies on a 1996 decision by the Ninth Circuit Court of Appeals, *Lester v. Chater*, 81 F.3d 821 (9th Cir. 1995), *as amended* (Apr. 9, 1996), in which the court faulted an ALJ for omitting the claimant's pain and depression from the

discussion of paragraph B criteria[10] upon finding that those "symptoms and signs" were attributable to his back impairment, not a mental impairment. *Id.* at 829-30 ("Pain merges into and becomes a part of the mental and psychological responses that produce the functional impairments. The components are not neatly separable. Given that the . . . physical and mental impairments are so inextricably linked, the Commissioner must consider whether these impairments taken together result in limitations equal in severity to those specified by the listings.").

Contrary to Yang's portrayal of the record, the ALJ did not refuse explicitly (or implicitly) to consider the effect of her physical impairments on the abilities to function contained in paragraph B. The ALJ stated at the outset of the step three discussion that he considered Yang's impairments in combination. (R. 25.) The ALJ then addressed Yang's physical impairments and found the extent of symptoms and limitations she described was not credible. (R. 25.) Yang does not challenge those determinations.

In addressing Yang's mental impairments, the ALJ specifically addressed her physical pain and resulting limitations in his discussion of activities of daily living. (R. 25.) He noted that she was able to drive, shop, prepare simple meals, perform simple chores, and provide some care for her disabled son. (R. 25.) The ALJ found that Yang

---

[10]   At the time of the ALJ's decision, the paragraph B criteria of Listing 12.04 were:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

had no mental impediments to taking care of her personal care needs, but that physical pain limited her abilities to dress, bathe, and carry laundry and groceries. (R. 25.) The ALJ further noted that physical pain had affected Yang's interest in and ability to engage in hobbies such as walking and sewing. (R. 25.) "Due to physical conditions and depression," the ALJ wrote, "the claimant has a personal care attendant for four and [a] half hours a day . . . ." (R. 25.) The ALJ observed that Yang's physical pain had become more limiting over time. (R. 25.) In discussing Dr. Butler's opinion in the context of the "concentration, persistence, or pace" criterion, the ALJ noted that Dr. Butler had declined to testify about Yang's physical impairments because they were outside her area of expertise, but the ALJ acknowledged that "it is clear that the claimant's physical pain is impacting her mental health issues." (R. 26.) Yang's assertion that the ALJ failed to consider her physical impairments in combination with her mental impairments is incorrect.

Even if the ALJ did not set forth his factual findings concerning the combined effects of Yang's physical and mental impairments in sufficient detail at step three, the ALJ fully discussed her physical and mental impairments at step four. In the Eighth Circuit, an ALJ's failure to make specific findings at step three is excusable as "a deficiency in opinion-writing" when there is other substantial evidence of record to support the ALJ's decision and thus no practical effect on the case. *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999). For example, an ALJ's findings at step four can cure a deficient step three analysis. *See Vance*, 860 F.3d at 1117-18 (where the ALJ made a conclusory determination at step three but elaborated on the impairments and

their limitations at step four, finding no error and concluding that "[a]n ALJ's failure to address a specific listing or to elaborate on his conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion."). Here, as discussed fully in Part III.C below, the ALJ's findings at step four are consistent with and provide support for his determination at step three that Yang did not meet or equal Listing 12.04.

Yang mentions the term "medical equivalence" in passing, without really explaining how the concept should apply to her case. (Pl.'s Mem. Supp. Mot. Summ. J. at 27.) It is important to the issues at hand, however, because "medical equivalence" determines when "a combination of impairments, no one of which meets a listing" will nonetheless be medically equivalent to that listing. *See* 20 C.F.R. § 404.1526(b)(3). In making this determination, the ALJ considers all evidence of record about the impairments and their effects on the claimant, including the opinions of medical and psychological consultants. 20 C.F.R. § 404.1526(c). Medical equivalence is a medical question, and thus is based strictly on medical findings. *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990); *Cockerham v. Sullivan*, 895 F.2d 492, 496 (8th Cir. 1990) ("[T]he question of whether a claimant meets a listed impairment is strictly a medical determination."). The ALJ does not consider age, education, work experience, or other vocational factors. 20 C.F.R. § 404.1526(c). Moreover, a claimant does not qualify for benefits under the equivalence standard "by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531-32 (1990) (citation omitted).

As the Court concluded above, the ALJ properly discounted the weight due to the opinions of Dr. Bebchuk, Dr. Mielke, Garrett, and Bailey.  Yang does not identify any other medical findings from which the ALJ could have found a combination of impairments that met or equaled Listing 12.04.  (Pl.'s Mem. Supp. Mot. Summ. J. at 27-28.)  Consequently, she has not shown the ALJ erred concerning medical equivalence.

Yang next surmises that because Dr. Butler found she was moderately restricted in three of the paragraph B criteria—based solely on her mental impairments and without any consideration to physical impairments—that any restrictions caused by her physical impairments would necessarily tip the scale into the "marked" category.  The Court disagrees.  To meet her burden, Yang must identify reliable medical evidence that would support marked restrictions in the paragraph B criteria; she may not rely on speculative compounding.

Next, Yang asserts that substantial evidence does not support the ALJ's consideration of the paragraph B criteria, and she identifies several reports and records that would support more restrictions than those found by the ALJ.  Essentially, Yang is asking the Court to reweigh the evidence.  But a court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the court would have decided the case differently.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  If it is possible to reach two different results from the evidence, and one of those is the position of the Commissioner, the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

24

In assessing the paragraph B criteria at step three, the ALJ found that Yang had mild restrictions in activities of daily living.  (R. 25.)  During the relevant period of time, Yang could cook simple meals, wash small loads of laundry, occasionally go to the doctor by herself, occasionally shop for groceries, and garden.  Nearly all of the evidence of moderate or marked restrictions in daily activities stems from Yang's own statements made to her providers or on function reports.  The ALJ found that Yang's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, however, and this finding is properly applied to other evidence in the record that is based on her statements.  *See Vance*, 860 F.3d at 1120.  While this Court might conclude that Yang's impairments caused moderate restrictions in activities of daily living, any corresponding error by the ALJ would be harmless, because a finding that Yang was moderately restricted in activities of daily living would not change the ALJ's finding at step three that Yang's impairments did not meet or equal Listing 12.04.

As to social functioning, the ALJ found that Yang was moderately restricted in this area.  (R. 26.)  This finding is supported by substantial evidence of record.  "Social functioning" refers to a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals" such as family members, friends, neighbors, grocery clerks, and coworkers.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.2.  Impaired social functioning may be evidenced through "a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation."  *Id.*  Although Yang did tend to socially isolate, she interacted appropriately with her children and her medical providers.  Indeed, her providers

25

routinely commented that Yang behaved appropriately and cooperatively, made good eye contact, had normal thought content and process, and was pleasant. (*E.g.*, R. 515-16, 520, 524, 708.) There is no evidence of altercations, evictions, firings, or fear of strangers. Yang could drive, shop, or attend appointments without being accompanied by one of her children, when necessary. Finally, consultative psychologist Dr. Clark opined that Yang was moderately limited in social functioning. (R. 78.)

The ALJ found that Yang was also moderately limited in concentration, persistence, or pace. (R. 26.) Numerous mental status examinations describe Yang's concentration, attention, and memory as ranging from moderately impaired to normal. (*E.g.*, R. 498, 499, 500-01, 515-16, 520, 720-21, 733, 745.) Dr. Clark opined that Yang was moderately limited in some, but not all, abilities related to concentration, persistence, and pace. (R. 76-77.)

In sum, the ALJ did not err in concluding at step three that Yang did not meet or equal Listing 12.04.

### C.    RFC

Yang challenges the ALJ's assessment of her RFC on several grounds. An RFC assessment measures the most a person can do, despite his limitations, in a work setting. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). But when an ALJ determines that a

26

claimant is not entirely credible, the ALJ may discount evidence that is based in part on self-reported symptoms. *See McCoy*, 648 F.3d at 617. In addition, "RFC is not simply a laundry list of impairments and limitations." *Gann v. Colvin*, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015). Thus, the ALJ may distill what may be numerous impairments and limitations into a descriptive phrase, such as "limited to simple, routine tasks with instructions that are visibly demonstrated," as long as it accurately captures a claimant's abilities in a work setting. *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding the ALJ's description of the claimant as "able to do simple, routine, repetitive work" adequately accounted for the claimant's borderline intellectual functioning).

Yang's first challenge to the RFC assessment is that the ALJ did not include limitations contained in the opinions of Dr. Bebchuk, Dr. Mielke, Garrett, and Bailey. An ALJ is not required, however, to include limitations suggested by a provider that the ALJ has properly considered and excluded. *See Ellis v. Barnhart*, 392 F.3d 988, 995, 997 (8th Cir. 2005)

Yang next argues that RFC is a medical question and the ALJ wrongly substituted his own opinion for the opinions of her medical providers. This argument disregards the fundamental precept that the RFC assessment is an issue reserved to the Commissioner, and while the ALJ must consider medical source opinions in assessing RFC, the final responsibility for determining RFC, applying vocational factors, and deciding whether a claimant is able to work belongs to the Commissioner alone. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) ("[O]pinions that a

claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight.").

Next, Yang claims that a language barrier would preclude her from effectively communicating at work and that the ALJ should have included this in the RFC. But the ALJ included a provision limiting Yang to instructions that could be demonstrated visually, thereby moderating the need for English proficiency. Moreover, Yang's language skills were apparently sufficient for her past work at Starkey Labs. Finally, there is evidence in the record demonstrating that Yang has sufficient English skills to comprehend and communicate effectively without an interpreter, at least to one of her medical providers. Certified nurse practitioner Deanna German noted in February 2014: "Patient is here today without interpreter but we were able to complete the visit as she has fair English language skills." (R. 466.) The treatment note is three full pages in length and documents a comprehensive visit and robust discussion about Yang's pain, depression, related symptoms, activities, medication regimen, treatment options, and follow-up care. (R. 466.)

Citing SSR 85-15, Yang next faults the ALJ for not considering the impact of stress on her mental impairments. To the contrary, the ALJ acknowledged that Yang had some difficulty managing stress and that her "back pain has been an ongoing stressor and has contributed to [her symptoms of depression, which has also been factored into the above-residual functional capacity." (R. 26, 29.) The ALJ properly discounted the opinion of Dr. Mielke, who found Yang incapable of working in even a low-stress job. He accepted, on the other hand, Dr. Butler's opinion that Yang's stress waxed and waned

according to situational stressors and levels of pain.  (R. 32.)  SSR 85-15 requires an ALJ

to include in the RFC assessment "impairment-related limitations created by an

individual's response to demands of work" including an inability to function in even a

low-stress job.  Here, the ALJ properly considered Yang's stress and included in the RFC

assessment the stress-related limitations he found credible and supported by medical and

other evidence.

The next point of error raised by Yang is that the ALJ did not include the need for

a cane in the RFC.  The ALJ noted documentation of Yang's use of a cane in the record,

but determined that her purported need to use a cane was inconsistent with her

conservative treatment history and refusal to consider surgery.  (R. 30.)  The Court finds

that the ALJ did not err in this respect.  Even though the ALJ gave little weight to

Dr. Mielke's Physical RFC Questionnaire, it is notable that Dr. Mielke did not include a

need to use a cane in the limitations section of the form.  (R. 601.)  In February 2014,

nurse practitioner Deanna Germain noted that Yang's daughter, not a medical provider,

had given her the cane.  (R. 466.)  Yet other evidence reveals that a PCA assessor, not a

medical provider, recommended that Yang use a tripod cane.  (R. 442.)  Yang also

identifies evidence from the National Dizzy and Balance Center to show that she needed

assistance with ambulation, but her dizziness and balance issues were resolved after

twelve appointments.  (R. 663.)  In addition, there are numerous treatment notes

reflecting normal gait, station, mobility, toe walk, heel walk, and lower extremity muscle

tone.  (R. 354, 365, 458, 472-73, 515, 692, 699, 765.)  Thus, though there is evidence that

Yang felt more stable when she used a cane, there is also substantial evidence that Yang

does not require a cane.  Finally, the ALJ accounted for evidence of instability, antalgic gait, slow walking, and the like by limiting Yang to sedentary work.

Yang argues that the ability to do activities such as light housework and visiting friends does not support a finding that she can perform full-time competitive work.  But Yang mischaracterizes the context of the ALJ's consideration of her daily activities.  An ALJ may properly consider a claimant's daily activities in assessing her credibility, *see Edwards v. Barnhart*, 314 F.3d 964, 965-66 (8th Cir. 2003), and that is what the ALJ did here (R. 28-30).

### D.    Past Relevant Work

Yang argues the ALJ erred in finding that she had the RFC to perform her past work as an assembler.  Although the ALJ has the responsibility of assessing a claimant's RFC, the claimant bears the burden at step four to demonstrate that she cannot perform her past relevant work.  *See Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).  If the claimant can perform her past relevant work, she is not disabled.  *Eichelberger*, 390 F.3d at 591.

There are three tests for determining whether a claimant has the capacity to perform her past relevant work:

> 1.  Whether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, e.g., "delivery job," "packaging job," etc.
> . . .
> 2.  Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it.
> . . .

> 3.  Whether the claimant retains the capacity to perform the functional
> demands and job duties of the job as ordinarily required by employers
> throughout the national economy.  (The *Dictionary of Occupational Titles*
> (DOT) descriptions can be relied upon—for jobs that are listed in the
> DOT—to define the job as it is *usually* performed in the national economy.)
> It is understood that some individual jobs may require somewhat more or
> less exertion than the DOT description.

SSR 82-61, 1982 WL 31387, at *1-2 (S.S.A. 1982).  SSR 82-61 further provides that "[a]

properly completed SSA-3369-F6, Vocational Report, may be sufficient to furnish

information about past work."  *Id.* at *2.  An ALJ may resolve variations between a

claimant's description and the DOT description by contacting the employer or the

claimant.  *Id.* Where a composite job has no exact counterpart in the DOT, the ALJ may

utilize the services of a vocational expert.  *Id.*

SSR 82-62 provides further guidance about comparing an RFC with the physical

and mental demands of past relevant jobs.  SSR 82-62, 1982 WL 31386, at *3 (S.S.A.

1982).  It reiterates that the claimant should be the primary source for information about

past work, and the claimant's statements "are generally sufficient for determining the

skill level[,] exertional demands[,] and nonexertional demands of such work."  *Id.*  The

ALJ should carefully appraise:

> (1) the individual's statements as to which past work requirements can no
> longer be met and the reason(s) for his or her inability to meet those
> requirements; (2) medical evidence establishing how the impairment limits
> ability to meet the physical and mental requirements of the work; and (3) in
> some cases, supplementary or corroborative information from other sources
> such as employers, the *Dictionary of Occupational Titles*, etc., on the
> requirements of the work as generally performed in the economy.

*Id.*  Given the "far-reaching implications," the ALJ must fully develop and explain the

determination of whether the claimant has the RFC to perform past work.  *Id.*

Appropriate documentation of past work may include details of "strength, endurance, manipulative ability, mental demands and other job requirements," as obtained from the claimant. *Id.* Job titles, dates, compensation, equipment used, required knowledge, the extent of supervision, the degree of independent judgment required, and a description of tasks and duties are also relevant. *Id.* For a claimant with a mental impairment, it is important to consider factors such as "speed, precision, complexity of tasks, independent judgments, [and] working with other people . . . to determine if the claimant's mental impairment is compatible with the performance of such work." *Id.*

Yang completed an SSA-3369-F6 form on December 17, 2013. (R. 240-47.) She described her work in medical device assembly as "us[ing] small tools to cut, scrape and create a hole and place the battery in the ear device then place it in my ear to test it on me whether it works and make noise." (R. 244.) She used machines, tools, and equipment, but did not need technical skills or knowledge, or writing skills. (R. 244.) In an eight-hour day, Yang typically walked for half an hour to an hour, stood for two hours, sat for six hours, handled large objects for one to three hours, handled small objects for six to eight hours, and reached for six to eight hours. (R. 244.) She frequently lifted ten pounds. (R. 244.) With respect to lifting and carrying, Yang carried boxes of medical devices from one station to another when she was finished with a box or needed more materials. (R. 244.) She was paid an hourly wage of $12, and she worked eight hours a day, five days a week. (R. 244.) Yang did not supervise other employees and was not a lead worker. (R. 244.)

In February 2016, about six months after the ALJ rendered his decision, Yang submitted to the Appeals Council an affidavit further describing her work as a medical device assembler. (R. 316-19.) Yang said she typically sat during the entire workday, except for two fifteen-minute breaks and a lunch break, and was not allowed to move around or adjust herself in her chair. (R. 316.) Assembling the devices required her to bend her head downward, which now would cause dizziness and vertigo. (R. 316.) She frequently needed fifteen to twenty minutes of verbal instructions to learn how to assemble a new device. (R. 317.) When she did not work quickly or accurately, her supervisor yelled at her, which was stressful. (R. 317-18.) One or two days a week, she was required to walk around a room all day delivering packages to other assemblers. (R. 316.)

Yang argues the ALJ did not properly consider whether she could perform her past relevant work as it was actually performed or generally performed. The Court agrees. In determining that Yang could perform her past relevant work, the ALJ did not refer to the SSA-3369-F6, Vocational Report, completed by Yang in December 2013. Instead, the ALJ cited to an exhibit that simply listed the name of the employer, the dates of employment, "medical ear device assembly line," hours per week, and hourly pay. (R. 33, 288.) The vocational expert's written Vocational Analysis reads simply: "Assembly: DOT . . . 712.687-034 / Exertional Level: Sedentary / Skill Level: Unskilled / Transferable Skills: Assembly." (R. 309.)

The form Yang completed in December 2013, on the other hand, contained much more information about her past work, including the use of small tools, machines, and

equipment; and time spent walking, standing, sitting, handling large and small objects, reaching, lifting, and carrying. (R. 244.) Of greatest concern is Yang's statement that she walked around the office carrying and delivering packages one or two days a week. This job requirement is not consistent with the RFC assessment. Given that the claimant should be the primary source for information about past work, the ALJ should have specifically considered Yang's statements about her past work.

Yang argues she is also precluded from working as an assembler as the job is generally performed. The ALJ determined in the written decision that Yang's past relevant work as an assembler was generally performed as described in DOT 712.687-034. The occupation described in DOT 712.687-034 is "Suture Winder, Hand." The job description reads:

> Winds single or multiple lengths of surgical catgut onto fiber suture reel: Pulls out holding flaps on reel, inserts end of strand under one flap, and places reel on power-driven wheel. Presses pedal to actuate wheel and guides strand under holding flaps as wheel spins to wind precut lengths or counts wheel revolutions to measure lengths. Turns reels by hand when winding numerous strands. Cuts catgut from spool, using scissors. Inserts completed reels in plastic envelopes for subsequent sterilization, or into glass tubes for future use.

DOT 712.687-034. Requirements of the job include carrying out detailed written or oral instructions, reading at a rate of 95-120 words per minute, and writing simple sentences. DOT 712.687-034.

Neither the vocational expert nor the ALJ discussed the job description or job requirements of DOT 712.687-034, or how those requirements and duties fit within Yang's RFC. Most significantly, the requirements to carry out detailed written or oral

instructions, read at a rate of 95-120 words a minute, write simple sentences, and not just

be exposed to but operate moving mechanical parts such as spinning wheels, reels, and

pedals simply do not comport with the RFC or Plaintiff's limited English skills. "When

there is an apparent unresolved conflict between [vocational expert] . . . evidence and the

DOT," the ALJ "must elicit a reasonable explanation for the conflict before relying on

the [vocational expert] . . . evidence to support a determination or decision about whether

the claimant is disabled." SSR 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).

The ALJ did not elicit a reasonable explanation for the inconsistencies in Yang's case.

The ALJ's decision will be reversed and remanded to the Commissioner for

reconsideration of whether Yang could perform her past relevant work as it was actually

performed or as it is generally performed. On remand, the Commissioner must consider

the SSA-3369-F6 form Yang completed on December 17, 2013, as well as the affidavit

Yang submitted to the Appeals Council in February 2016. The Commissioner may also

obtain additional evidence from Yang and/or information from other sources such as

employers. The Commissioner must also reconcile the conflict between the vocational

expert evidence and DOT 712.687.034.

Accordingly, based on all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.     Plaintiff Su Yang's Motion for Summary Judgment [Doc. No. 16] is

**GRANTED**;

2.      Defendant Commissioner Nancy A. Berryhill's Motion for Summary Judgment [Doc. No. 18] is **DENIED**; and

3.      This matter is **REMANDED** for reconsideration of whether Yang could perform her past relevant work as it was actually performed or as it is generally performed, as set forth fully in Part III.D.


**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated:  March 12, 2018                  _s/ Hildy Bowbeer_____
                                        HILDY BOWBEER
                                        United States Magistrate Judge

36